AMERICAN CIVIL LIBERTIES UNION OF CENTRAL OHIO, on Behalf of its DELAWARE COUNTY, OHIO MEMBERS; Daniel E. Anderson and Kellan Haines, Plaintiffs,

v.

COUNTY OF DELAWARE, a political subdivision of the State of Ohio, Defendant.

No. C2-88-1284.

United States District Court, S.D. Ohio, E.D.

Dec. 5, 1989.

---

Julia A. Davis, Samuel J. Cordes, Schwartz, Kelm, Warren & Rubenstein, Columbus, Ohio, for plaintiffs.

W. Duncan Whitney, Pros. Atty., Delaware, Ohio, for defendant.

## OPINION AND ORDER

GRAHAM, District Judge.

For several years, the County of Delaware, Ohio has displayed a nativity scene on the county courthouse lawn during the Christmas holiday season. On December 13, 1988, however, the American Civil Liberties Union of Central Ohio ("A.C.L.U.") and two of its members brought this action, seeking an injunction prohibiting the display. Plaintiffs claim that the defendant's expenditure of public funds toward the nativity scene and the display of the nativity scene constitute an establishment of religion in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs base their cause of action on 42 U.S.C. § 1983 and seek a declaratory judgment, nominal damages, and costs and attorneys' fees as well as injunctive relief.

On December 15, 1988, two days after the complaint was filed, this Court denied the plaintiffs' motion for a temporary restraining order, relying upon the decision of the Supreme Court of the United States in *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). In *Lynch,* the Supreme Court held that a nativity scene displayed by the City of Pawtucket, Rhode Island did not violate the Establishment Clause when viewed in the context of the Christmas holiday season. *Id.* at 679–85, 104 S.Ct. at 1362–65. The instant Court noted, however, that the *Lynch* decision had been inconsistently construed by the lower courts and that the Supreme Court had undertaken review of another nativity scene case in *American Civil Liberties Union v. County of Allegheny,* 842 F.2d 655 (3d Cir.), *cert. grant-*ed, —— U.S. ——, ——, 109 S.Ct. 53, 54, 102 L.Ed.2d 32, 32 (1988).

On July 3, 1989, the Supreme Court issued its decision in *County of Allegheny v. American Civil Liberties Union,* —— U.S. ——, 109 S.Ct. 3086, 106 L.Ed.2d 472. For reasons which will become apparent from the following discussion, that decision did not provide a clear answer to the present case. Therefore, the plaintiffs requested the opportunity to conduct discovery. The Court entered a scheduling order on July 18, 1989, providing cutoff dates for the completion of discovery and the filing of dispositive motions. On October 6, 1989, plaintiffs filed their motion for permanent injunction, and on October 30, 1989, the defendant filed its reply brief. According to the local press, Delaware County re-erected its nativity scene during the week of November 27, 1989 in exactly the same form and in exactly the same context as it did last year. *See* Columbus Dispatch, Nov. 30, 1989 at 1D. The matter is now before the Court for decision.

*County of Allegheny* involved two holiday displays. The nativity scene display inside the Allegheny Courthouse was struck down as unconstitutional by five Justices of the Supreme Court whereas the Chanukah menorah and Christmas tree display in front of the City–County Building was upheld by six Justices.

Rather than solidifying its position on nativity scene cases, however, the Supreme Court appears to have become more divided on the issue than ever. In *County of Allegheny,* Justice Blackmun announced the judgment of the Court but delivered the opinion of the majority of the Court only in respect to Parts III–A, IV, and V of his opinion. Justice Blackmun was joined in these Parts of his opinion by Justices Brennan, Marshall, Stevens, and O'Connor. Justice O'Connor, however, wrote an opinion concurring in part and concurring in the judgment, in Part II of which Justices Brennan and Stevens joined. Justice Brennan filed an opinion concurring in part and dissenting in part, in which Justices Marshall and Stevens joined, and Justice Stevens authored an opinion concurring in part

and dissenting in part, in which Justices Brennan and Marshall joined. Finally, Justice Kennedy penned an opinion concurring in the judgment in part and dissenting in part, in which Chief Justice Rehnquist and Justices White and Scalia joined. In short, a majority of the Supreme Court has not reached a consensus on nativity scene cases.

In Part I of Justice Blackmun's opinion, he described the holiday displays at issue in *County of Allegheny.* The first display was a nativity scene located on the "Grand Staircase" inside the Allegheny County Courthouse. The nativity scene itself was composed of a wooden manger, inside and in front of which were placed figures of the infant Jesus, Mary, Joseph, farm animals, shepherds, and wise men. As noted by Justice Blackmun, located on the crest of the manger was the figure of an angel bearing an almost illegible banner which read, "Gloria in Excelsis Deo!" *County of Allegheny,* —— U.S. at —— n. 5, 109 S.Ct. at 3094 n. 5. Descending from each end of the manger were two sections of wooden fence which were joined at the base of the staircase by a third section of wooden fence. A plaque on this front section of the fence read, "This Display donated by the Holy Name Society." The Holy Name Society was a Roman Catholic group which Allegheny County had allowed to display the nativity scene. Red and white poinsettia plants were placed along the base of the wooden fence. Two small evergreen trees, each adorned with a red bow, were located on either side of the manger. Two other small evergreen trees were placed on each side of the staircase next to signs indicating the direction to county offices. Two large wreaths, each decorated with a large red ribbon, were hung in arched windows behind the staircase. Near the staircase was a "gallery forum" used for art and other cultural exhibits. However, the nativity scene "was distinct and not connected with any exhibit in the gallery forum." *County of Allegheny,* —— U.S. at ——, 109 S.Ct. at 3094. Other Christmas decorations were displayed in various departments and offices within the courthouse but were not visible from the Grand Staircase.

The nativity scene was used as a setting for Allegheny County's annual Christmas Carol Program. This Program was dedicated to world peace, prisoners of war and those missing in action in Southeast Asia. High school choirs and other musical groups performed religious and secular holiday music during lunch hours in the month of December. *Id.* at —— – ——, 109 S.Ct. at 3093–94.

The second display was located at the City–County Building jointly owned by Allegheny County and the City of Pittsburgh. This display consisted of a forty-five foot tall Christmas tree and an eighteen foot tall Chanukah menorah. The Christmas tree was located directly beneath the middle arch of the City's entrance to the building, and the menorah was placed next to the tree against one of the columns of the middle arch. At the foot of the Christmas tree was a sign which bore the name of the Mayor of Pittsburgh and the title "Salute to Liberty." Underneath the title was the following message:

> During this holiday season, the City of Pittsburgh salutes liberty. Let the festive lights remind us that we are the keepers of the flame of liberty and our legacy of freedom.

The City erected both the menorah and the Christmas tree. Although the menorah was stored by the City as well, the menorah was actually owned by a Jewish group known as Chabad. The nine branch menorah is the primary symbol of the Jewish religious holiday of Chanukah. *Id.* at —— – ——, 109 S.Ct. at 3094–98.

The Supreme Court's judgment was that the nativity scene display violated the First and Fourteenth Amendments but that the Christmas tree and Chanukah display at least did not have the principal or primary effect of advancing religion, although the other two prongs of the *Lemon* test employed by the Supreme Court were appropriate for consideration on remand. *Id.* at ——, 109 S.Ct. at 3117. (The *Lemon* test is set forth *infra*).

The First Amendment provides in pertinent part as follows:

Congress shall make no law respecting an establishment of religion.

This prohibition has been held applicable to the states pursuant to the Due Process Clause of the Fourteenth Amendment. *Murdock v. Pennsylvania,* 319 U.S. 105, 108, 63 S.Ct. 870, 872, 87 L.Ed. 1292 (1943). In Part III–A of Justice Blackmun's opinion, he set forth basic principles which a majority of the Court have agreed are to be utilized in applying the Establishment Clause. In particular, he reaffirmed the three-part test articulated by the Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

> Under the *Lemon* analysis, a statute or practice which touches upon religion, if it is to be permissible under the Establishment Clause, must have a secular purpose; it must neither advance nor inhibit religion in its principal or primary effect; and it must not foster an excessive entanglement with religion.

*County of Allegheny,* —— U.S. at ——, 109 S.Ct. at 3100. In regard to the second prong of the *Lemon* test, the majority held that a governmental action will be considered to unconstitutionally advance religion if it "has the purpose or effect of 'endorsing' religion." *Id.* Endorsement occurs if government favors, prefers, or promotes one religion or religious belief over another or over disbelief, or if government conveys or attempts to convey that religion or a particular religious belief is favored or preferred. *Id.* "The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.' " *Id.* (quoting Justice O'Connor's concurring opinion in *Lynch,* 465 U.S. at 687, 104 S.Ct. at 1367).

Although a majority of the Supreme Court concurs that the "endorsement" test is the appropriate inquiry for determining whether a governmental action impermissively advances religion, a diversity of opinion exists as to how the "endorsement" test is to be defined and applied. In Part III–B of his opinion, Justice Blackmun, joined by Justice Stevens, purported to follow Justice O'Connor's concurring opinion in *Lynch* by concluding that "[t]he effect of the display depends upon the message that the government's practice communicates: the question is 'what viewers may fairly understand to be the purpose of the display.' " *County of Allegheny,* —— U.S. at ——, 109 S.Ct. at 3102 (quoting Justice O'Connor's concurring opinion in *Lynch,* 465 U.S. at 692, 104 S.Ct. at 1369). If viewers may fairly understand the purpose of a display to be government endorsement of religion, then that display unconstitutionally advances religion.

In Justice O'Connor's concurring opinion in *County of Allegheny,* she characterized the "endorsement" test in a different fashion.

> In my concurrence in *Lynch,* I suggested a clarification of our Establishment Clause doctrine to reinforce the concept that the Establishment Clause "prohibits government from making adherence to a religion relevant in any way to a person's standing in the political community." The government violates this prohibition if it endorses or disapproves of religion. "Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." Disapproval of religion conveys the opposite message.

*County of Allegheny,* —— U.S. at ——, 109 S.Ct. at 3118 (citations to *Lynch* omitted).

In Justice Brennan's minority opinion, he stated that "the display of an object that 'retains a specifically Christian [or other] religious meaning,' is incompatible with the separation of church and state demanded by our Constitution." *Id.* at ——, 109 S.Ct. at 3124 (quoting his dissenting opinion in *Lynch,* 465 U.S. at 708, 104 S.Ct. at 1377; bracketed language inserted by Justice Brennan in *County of Allegheny* ). As applied by Justice Brennan, the "endorsement" test prohibits the government display of any object that retains "some religious significance." *County of Allegheny,* —— U.S. at ——, 109 S.Ct. at 3126.

In Justice Stevens' minority opinion, he did not expressly address his view of the "endorsement" test. Rather, he opined that "the Establishment Clause should be construed to create a strong presumption against the display of religious symbols on public property" and that this presumption "will prohibit a display only when its message, evaluated in the context in which it is presented, is nonsecular." *Id.* at —— —— ——, 109 S.Ct. at 3131–32.

Justice Kennedy's opinion, in which the Chief Justice and Justices White and Scalia joined, proposed an entirely different approach to the second prong of the *Lemon* test.

> Our cases disclose two limiting principles: government may not coerce anyone to support or participate in any religion or its exercise; and it may not, in the guise of avoiding hostility or callous indifference, give direct benefits to religion in such a degree that it in fact "establishes a [state] religion or religious faith, or tends to do so."

*Id.* at ——, 109 S.Ct. at 3136 (quoting *Lynch*, 465 U.S. at 678, 104 S.Ct. at 1362) (bracketed language inserted by Justice Kennedy). Justice Kennedy would find an unconstitutional advancement of religion only upon a sufficient showing of governmental coercion on behalf of or direct benefit to a religion. Impermissible coercion would include not only direct but indirect coercion in the form of symbolic recognition or accommodation of religion in extreme cases where it would establish or tend to establish a state religion or religious faith. *Id.* —— U.S. at —— – ——, 109 S.Ct. at 3137–38. Generally, however, "[g]overnment policies of accommodation, acknowledgment, and support for religion are an accepted part of our political and cultural heritage." *Id.* at ——, 109 S.Ct. at 3135.

Despite this diversity of positions, a majority of the Supreme Court has reached agreement on certain basic principles of Establishment Clause analysis in the context of religious holiday displays. First, the three-part *Lemon* test provides the basic framework for analysis. Second, the key inquiry in regard to the second prong of the *Lemon* test, *i.e.* whether a governmental action advances religion, is whether the governmental action has the purpose or effect of "endorsing" religion. A majority of the Supreme Court, however, has not reached agreement on the exact meaning and application of the "endorsement" test.

On one hand, Justices Brennan, Marshall, and Stevens would apply the "endorsement" test to prohibit the government display of an object retaining any religious significance. Under their approach, one would be hard pressed to imagine any context in which a nativity scene could be displayed by a government entity. Although Justice Stevens appears to place more confidence in the ability of context to negate a display's religious significance, his application of his view in regard to nativity scenes is as restrictive as the position of Justices Brennan and Blackmun. Indeed, these Justices found both the nativity scene and menorah displays in *County of Allegheny*, as well as the nativity scene in *Lynch* to be unconstitutional.

On the other hand, Justices Kennedy, White, Scalia, and the Chief Justice would dispense with the "endorsement" test altogether and allow the government display of any religious object unless it could be considered as coercion "to support or participate in any religion or its exercise." *County of Allegheny*, —— U.S. at ——, 109 S.Ct. at 3136. Thus, nearly all displays of nativity scenes by government entities would be permissible in the context of the Christmas holiday season. Indeed, this was the holding of the majority opinion in *Lynch*. These Justices would find both displays in *County of Allegheny* and the display in *Lynch* to pass constitutional muster.

Between these two polar positions, Justices Blackmun and O'Connor have attempted to articulate a middle ground. In applying the "endorsement" test, however, Justice Blackmun leans toward the more restrictive approach of Justices Brennan, Marshall, and Stevens. According to Justice Blackmun, the purpose of a religious holiday display as interpreted in light of its

context must be a celebration of the secular aspects of the holiday only. *County of Allegheny*, at ——, 109 S.Ct. at 3114. Therefore, if a secular symbol of the holiday is available, it generally, although not necessarily, must be employed to convey "the government's secular message." *Id.* In contrast, Justice O'Connor would not discount the religious significance of an element such as a nativity scene or menorah in a holiday display, but instead, would find the combination of both secular and sacred symbols to convey the permissible "message of pluralism and freedom of belief during the holiday season." Id. at ——, 109 S.Ct. at 3123. A predominantly religious symbol need not therefore be camouflaged or subsumed within the secular aspects of a holiday before it can be displayed by a government entity. A government entity can acknowledge "a public holiday celebrated by both religious and nonreligious citizens alike" as long as "[a] reasonable observer would ... appreciate that the combined display is an effort to acknowledge the cultural diversity of our country and to convey tolerance of different choices in matters of religious belief or nonbelief by recognizing that the ... holiday season is celebrated in diverse ways by our citizens." *Id.* at ——, 109 S.Ct. at 3123. In Justice O'Connor's view, the availability of a more secular alternative symbol is irrelevant. *Id.*

Four Justices would hold that nearly all displays of nativity scenes during the Christmas holiday season would be constitutional. Justice O'Connor's position being the next least restrictive, her view would appear to be determinative as to the scope of the Establishment Clause's reach. If a nativity scene passes muster under Justice O'Connor's analysis, then a majority of the Court will find it constitutionally permissible. The instant Court must therefore analyze the case before it in light of the principles articulated by Justice O'Connor.

■ The case before this Court involves a nativity scene which has been displayed for the past several years during the Christmas holiday season on the lawn of the Delaware County Courthouse near the front left-hand corner of the building. During the 1988 holiday season, the nativity scene consisted of a rather plain manger constructed of wood. Located inside the manger were painted figurines of Mary, Joseph, three wise men, and the infant Jesus. The County of Delaware owns, stores, and erects this display and provides the electricity to light it at night.

The nativity scene is located a short distance behind a concrete sign reading, "DELAWARE COUNTY COURTHOUSE." A sidewalk leading from the street to the front entrance of the courthouse passes within a few feet of the nativity scene. Centered in front of the courthouse is a flagpole which flies the American flag and in front of the flagpole are three war memorials commemorating veterans of different wars in which Delaware County residents have served their country. An approximately four to five foot tall evergreen "peace tree" decorated with Christmas decorations was located to the right of the war memorials on the right-hand front lawn. This tree was located approximately ninety feet from the nativity scene and was apparently designated a "peace tree" by the County or the public grade school class which decorated the tree.

The Court concludes that the nativity scene display runs afoul of the Supreme Court's decision in *County of Allegheny*. The context of the display is more like the nativity scene display in *County of Allegheny* than the menorah display in *County of Allegheny* or the nativity scene in *Lynch*. The nativity scene in *Lynch* was owned by the City of Pawtucket, Rhode Island and was displayed in a privately owned park "in the heart of the shopping district." *Lynch*, 465 U.S. at 671, 104 S.Ct. at 1358. The *Lynch* nativity scene consisted of

> many of the figures and decorations traditionally associated with Christmas, including, among other things, a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cut-out figures representing such characters as a clown, an elephant, and a teddy bear, hundreds of

colored lights, a large banner that reads "SEASONS GREETINGS" and the creche.

*Id.*

The only secular aspect of the Christmas holiday season located anywhere near the Delaware County display was the "peace tree." Like the gallery forum in the Allegheny County Courthouse, the peace tree is "distinct and not connected with" the nativity scene. *See County of Allegheny,* —— U.S. at ——, 109 S.Ct. at 3094. The flagpole and war memorials in front of the Delaware County Courthouse are permanent fixtures and not relevant to this analysis. This Court concludes that the relatively small size of the tree coupled with its distance from the nativity scene prevents it from combining with the nativity scene to convey a message of plurality and diversity. They are not one unified display, but separate and unrelated. A viewer would not associate them; indeed, many who viewed the nativity scene would probably not even notice the peace tree.

According to this Court's understanding of the United States Supreme Court's decision in *County of Allegheny,* the Delaware County display impermissively advances religion.

■ Contrary to the plaintiffs' contentions, however, a nativity scene display need not be surrounded, subsumed, or camouflaged by secular symbols in order to satisfy *County of Allegheny.* Indeed, the eighteen foot tall menorah in the display that was held not to constitutionally advance religion was accompanied solely by a forty-five foot tall Christmas tree that was located several feet away and in no way obstructed the view of the menorah. Furthermore, Justice O'Connor concluded that the predominantly religious significance of the menorah did not need to be abridged but merely combined with a secular symbol of the holiday in such a way as to communicate pluralism and cultural diversity. Justice O'Connor did not elaborate, however, on whether a Christmas tree would be sufficient to communicate pluralism and diversity if combined with a symbol of Christianity in another context.

Nevertheless, this Court reaches its decision in this case with considerable regret. History and logic would lead me to the result which it believes Chief Justice Burger intended in *Lynch,* namely that the display of a nativity scene at Christmas always has a secular purpose, to recognize the undeniable fact that the holiday which our nation celebrates on the twenty-fifth of December commemorates the birth of Jesus of Nazareth, and that the recognition of the historical origin of the holiday does not violate the Establishment Clause. Indeed, the birth of Jesus has had an unparalleled impact upon secular history for the past 2,000 years. Countless persons of historical import who have recognized the influence of Jesus of Nazareth on their lives and works are strewn throughout the pages of our history books. If his influence was limited solely to the religious aspect of their lives, then perhaps secular recognition would not be appropriate. On the contrary, however, this influence affected and shaped their thinking and deeds in areas for which they have been immortalized by history. From the writings of Augustine to the oratory of Martin Luther King, Jr., the work of great philosophers, statesmen, artists, and scientists have been touched by the influence of Jesus of Nazareth. Events such as the Crusades, Oliver Cromwell's Protectorate over England, and the Reformation in Europe resulted in tremendous change in the social, political and economic institutions and structures of their times.

In short, the pervasive influence of Jesus of Nazareth on secular history is undeniable. Failure to understand the origins of this influence and how history has been altered thereby will lead to a stultified view of history. Government certainly has a legitimate interest in recognizing the birth of one acknowledged as being the genesis of one of the most significant historic forces of modern history. Any benefit or advancement of religion flowing from a nativity scene is secondary to the historical significance. The drafters of the First Amendment certainly did not intend for government recognition of history to be sacrificed to the eradication of all mention of religion. To do so does indeed result in

the hostility to religion about which the Chief Justice, Justices Kennedy, White, Scalia, and even O'Connor were concerned. The failure of government to recognize the secular significance of any religion or religious figure, not just those associated with Christianity, constitutes an endorsement of disbelief over belief and a disestablishment of religion. The fact that certain religious and religious figures have had greater impact on our culture than others should not prevent governmental recognition of their contributions to secular history. Instead, government entities should be afforded deference in acknowledging the secular significance flowing from those religions and religious figures.

The test articulated by Justices Blackmun and O'Connor in *County of Allegheny* does not adequately address these concerns. A balancing test may be appropriate in other contexts but not in the case of a nativity scene displayed at Christmas. The rule advocated by Justices O'Connor and Blackmun is subjective and imprecise and turns on esthetic nuances and other considerations more properly within the domain of interior decorators and graphic designers than judges. Although disagreeing with Justice Brennan's minority opinion in this case, the Court agrees with his statement that the balancing approach results in "making analysis under the Establishment Clause look more like an exam in Art 101 than an inquiry into constitutional law." *County of Allegheny,* —— U.S. at ——, 109 S.Ct. at 3127. Whether a display violates the Constitution will usually lie in the judgment of the eye of the beholder. This approach will lead to increased litigation over such displays generating bitter controversy which will divide communities, totally at odds with the spirit of the holiday being celebrated.

This Court believes strongly that there should be clear-cut rules to guide local government in this area. Elected public officials should not be required to act at their peril in deciding whether or not to display or permit the display on public property of a symbol which recognizes the religious origins of the national holiday celebrated on December the twenty-fifth. The balancing test is unworkable and will lead to unpredictable results and subject local governments to possibly large awards of attorneys' fees, thus chilling the willingness of public officials to become involved with holiday displays. This Court believed the matter was properly settled in *Lynch v. Donnelly.* Chief Justice Rehnquist and Justices Kennedy, White, and Scalia have set forth the correct rule for such cases, as did former Chief Justice Berger in *Lynch.*

■ In conclusion, the Court declares that the Delaware County nativity scene is unconstitutional in its present form. Plaintiffs' motion for a permanent injunction is therefore GRANTED. The County of Delaware is hereby enjoined from displaying the nativity scene in its present form. However, the County of Delaware is not precluded from maintaining ownership of the nativity scene or from expending funds to store it. In the event that the County may desire to change the display to bring it into compliance with *County of Allegheny,* the Court will withhold final judgment pending further developments. Plaintiffs not having addressed their rights to nominal damages, attorneys' fees, or costs, the Court grants them fifteen days to file a memorandum supporting their entitlement to this relief. Defendant shall have fifteen days to file a responding memorandum.

It is so ORDERED.