Patricia Smith KING and Joseph J. King, Jr., Plaintiffs-Appellants-Petitioners,

v.

VILLAGE OF WAUNAKEE, A Wisconsin Municipal Corporation, Maureen O'Malley, Jeff Murphy, Dennis Sweno, Patrick Gile, Patrick Strickland, Paul Holmes and Suzanne Matiash, Defendants-Respondents.

Supreme Court

*No. 92–0551. Oral argument January 7, 1994.—Decided June 22, 1994.*

(Also reported in 517 N.W.2d 671.)

For the plaintiffs-appellants-petitioners there were briefs and oral argument by *Bronson C. LaFollette,* Madison.

For the defendants-respondents there was a brief by *Craig L. Parshall* and *The Rutherford Institute,* Fredericksburg, VA and *Frank Bucaida* and *Axley Brynelson,* Madison and oral argument by *Craig L. Parshall.*

DAY, J.   This is a review of a published decision of the court of appeals, *King v. Village of Waunakee,* 175

Wis. 2d 300, 499 N.W.2d 237 (Ct. App. 1993), affirming a summary judgment of the circuit court for Dane County, Honorable P. Charles Jones, Judge, which granted summary judgment dismissing the action of the plaintiffs to enjoin the Village of Waunakee from displaying a "creche" that was part of a Christmas season holiday display in a park owned by the Village. We affirm the court of appeals.

> "Oyez, oyez, oyez." the Honorable, Chief Justice and the Associate Justices of the Supreme Court of the United States. All persons having business before this honorable Court are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this honorable Court.[1]

Thus, does the highest Court in the land recognize the Almighty and implores His protection for the country and for the Court. It's obvious the Court sees no violation of the Establishment Clause of the First Amendment to the United States Constitution in the Court's opening declaration. Chief Justice Rehnquist recalls his impressions when he first heard it and comments: "It was a ritual that had been used to open Anglo-Saxon courts for many centuries." *Id.*

Justice Sandra Day O'Connor in her concurrence in *County of Allegheny v. American Civil Liberties U.,* 492 U.S. 573, 630–631, 109 S. Ct. 3086 (1988) says:

> It is the combination of the longstanding existence of practices such as opening legislative sessions with legislative prayers or opening Court sessions with 'God save the United States and this honorable

---

[1] *The Supreme Court, How It Was, How It Is,* by William H. Rehnquist, William Morrow and Company, Inc., p. 31 (1987).

Court,' as well as their nonsectarian nature, that leads me to the conclusion that those particular practices, despite their religious roots, do not convey a message of endorsement of particular religious beliefs.

She refers to such as "examples of ceremonial deism." *Id.*

These examples of public prayers illustrate the profound connection to religion and the Supreme Being that has infused our national life from the beginning. Justice O'Connor's comments explaining her acceptance of the invocation of Deity in the opening court ceremony also shows the ambivalence that must of necessity attend every attempt to apply the meaning of the establishment clause to an infinite variety of fact situations as our people and our various levels of government seek suitable means to celebrate our various holidays.

It is the United States Supreme Court whose evolving and changing interpretation of the phrase, "respecting an establishment of religion," that perforce determines the outcome of the case before us.

## FACTS

The facts as to what is in the annual holiday season display in the case before us are not in dispute. The display shows figures representing the baby Jesus, St. Mary and St. Joseph and other figures. A description along with other pertinent matters involved in this case are set forth in the affidavit of Honorable Maureen O'Malley, President of the Village of Waunakee, Board of Trustees, and is part of the record. Similar affidavits of other Trustees are also in the record. President O'Malley's affidavit reads in part as follows:

. . . As a Village of Waunakee resident, your affiant is familiar with the Village of Waunakee's annual holiday season display . . . The Village of Waunakee is a Wisconsin municipality with a population of approximately 6,000. . . . For approximately forty years the Village of Waunakee has displayed an annual holiday season display in a local park adjacent to the primary business district in the Village of Waunakee . . . The . . . display was put up on November 20, 1990, and removed on January 3, 1991. The site of the . . . display is located eight blocks (approximately three-quarters of a mile) from the Waunakee Village Hall. . . . On or about November 30, 1990, the Village of Waunakee received a letter from the attorney for the Freedom From Religion Foundation ('FFRF') demanding that the Village remove its . . . display from Waunakee Park. . . . The November 30, 1990, letter was discussed at the December 5, 1990, Village Board meeting but no action was taken at that time as the matter was not on the board meeting agenda. . . . At the December 17, 1990, Village Board meeting, the Waunakee Village Board considered the demand to remove the . . . display from Waunakee Park. The Village Board voted to modify the . . . display, based upon advice of the Village's attorney, to assure that display was consistent with the law. . . . The . . . display, as modified pursuant to the Village Board's December 17, 1990, vote, consists of three large evergreen trees which were decorated with colored Christmas lights, a nativity scene, a sign saluting liberty and extending holiday wishes, and a flagpole decorated with colored Christmas tree lights and a plaque of a five pointed star. . . . Each of the evergreen trees is over twenty feet in height and has a diameter of approximately seven feet. Each tree is decorated with colored Christmas tree lights. Two of the Christmas trees were directly behind and

29

immediately to the left and right of the nativity scene. The third Christmas tree is in front of the liberty sign, nativity scene and the two other Christmas trees. Attached hereto as Exhibit 1 are true and correct copies of photographs which accurately represent the 1990 . . . display. . . . The dimensions of the nativity scene are as follows: the stable is seven feet in height, thirty-two inches deep, and seven and one-half feet in width. The creche is adorned with colored Christmas lights. Wood silhouette figures of three shepherds/wise men and three sheep are located to the left and right of the stable. . . . The Waunakee . . . display also includes decoration of the Waunakee Park flagpole with colored Christmas tree lights and a plaque on which there is a five pointed star. The flagpole is located between two of the large Christmas trees and immediately behind the creche. . . . The . . . display also includes a sign, the dimensions of which are eight feet square. The sign contains the following message written in the holiday colors of red and green:

'*During the Holiday Season, the Village of Waunakee salutes liberty. Let these festive lights and times remind us that we are the keepers of the flame of liberty and our legacy of freedom. Whatever your religion or beliefs, enjoy the holidays*

Waunakee Village Board'
(Emphasis added)

The sign is decorated with red ribbons and green garland.

. . . The . . . display is stored in the Village garage when it is not on display. Consequently, no Village funds are expended for storage of the . . . display. . . . The nativity scene which is part of the . . . display

30

was not purchased by the Village of Waunakee, but rather, was donated to the Village. . . . As part of the Village of Waunakee's celebration of the winter holiday season, the Village decorates the light poles on both sides of Main Street (Highway 113) with garlands and Christmas ornaments. Waunakee Park, where the Village's . . . display is located, is also on Main Street. . . . With the exception of the present lawsuit, your affiant is not aware of any other complaint ever made to a Village of Waunakee official relating to the Village's . . . display. . . . The Village of Waunakee has not and will not consult with any church or religious organization relating to the content or display of the Village's . . . display. . . . The only tax dollars expended by the Village relating to the . . . display are for electricity for lighting the display, including the Christmas trees, and salaries and benefits of Village employees to erect and remove the . . . display annually. This amount is minimal and does not exceed $500.00 annually. . . . Your affiant voted on December 17, 1990, to continue to display the Village of Waunakee's . . . display because your affiant believed that the display served the following functions and purposes: to promote community goodwill during the holiday season; to encourage visitors to and citizens of Waunakee to come to the Village's business district; to continue the Village's long-standing tradition of recognizing the national holiday of Christmas and its historical origins; and to recognize that there is significant public sentiment among Village citizens in favor of the . . . display.

The first question is, does the Waunakee annual holiday season display violate the "Establishment Clause" of the First Amendment to the United States Constitution?

We conclude that it does not.

The Clause reads: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ."

The word "respecting" means "concerning, regarding, about, anent."[2]

"(Religion) . . . as used in constitutional provisions or First Amendment forbidding the 'establishment of religion', the term means a particular system of faith and worship recognized and practiced by a *particular church, sect, or denomination.*" (Emphasis added.)[3]

This amendment was adopted so that Congress could not establish a national church or interfere with churches already "established" and tax supported in several of the states, some of which laws still existed in the early 1800's.

As pointed out by Petitioners in their brief to this Court:

> The original purpose of providing that Congress 'shall make no law respecting an establishment of religion' was to prevent the national government from setting up an established church (like the Church of England), that is, a church financed and controlled by government and accorded privileges denied other religious groups. The establishment clause was designed to secure the religious liberties of those people who did not belong to whatever denomination might have become the national church. Congress was not to take sides in the competition among religious groups. (Citations omitted).

---

[2] *Webster's Dictionary of Synonyms,* G. & C., Merriam Co., pub. Springfield, Mass (1942).

[3] *Blacks Law Dictionary,* p. 1292 (6th ed. 1990).

The United States Supreme Court over the last several years has given the word "establishment" a more expanded meaning than that envisioned by the framers.

James Madison, the "Father of the Constitution" had proposed that the amendment read:

> The civil rights of none shall be abridged on account of religious belief or worship, *nor shall any national religion be established,* nor shall the full and equal rights of conscience be in any manner, or on any pretext, infringed." 1 Annals of Cong. 434 (1789) (Emphasis added).

Justice Stevens Concurrence, *Allegheny,* 492 U.S. at 647.

Because of the objection of the anti-Federalists to its use of the word, "national," he withdrew it and went along with the wording adopted.

The United States Supreme Court has recently been interpreting "establishment" to mean "endorsement" not of a "particular church, sect, or denomination" but of "religion" in the broadest sense such as "all religions."

These interpretations are, of course, binding on us and we must determine what effect these interpretations have on the legality of the Waunakee display.

One of the principal cases is the opinion authored by former Chief Justice Warren Burger in *Lynch v. Donnelly,* 465 U.S. 668, 104 S. Ct. 1355, 79 L. Ed. 2d 604 (1984). It comes close to our case since it involves a nativity scene and speaks to the whole history and role of holiday displays that may involve "religious" subjects and the proper and permitted use of such in recognition of the history and cultural significance of the holiday in question.

33

*Lynch* had a creche that "was part of a display with other non-religious" figures and symbols such as a Santa house, reindeer, a "talking wishing well," candy canes and similar items.

A brief history of the cultural development of this social phenomenon that has been going on for centuries and that leads finally to a group of homemade figures celebrating Christmas in a small park in the little Village of Waunakee, Wisconsin, might be in order.

What is often perceived as "religious" or "Christian" when seen in historical perspective is in reality a cultural overlay that has developed, in a sense, "a life of its own" and often is quite attenuated to the particular event to which it seems to relate.

Christmas or "Christ's Mass" was not celebrated until the fourth century. In the fifth century the date of December 25 was made official by the Western Church (The Eastern Church celebrated January 6). The West adopted the old Roman feast of the birth of the Sun. The actual date of Jesus' birth was not known. Among the Germanic and Celtic tribes the winter solstice or the return of the sun in December was celebrated long before the adoption of Christianity and was known as "yule" a term still used for the season. The holly, the mistletoe, the yule log and the wassail bowl are relics of pre-Christian times.[4] Thus, the very celebration has a unique history of its own. We even retain the names of some of our pre-Christian gods in the days of the week: Tuesday for Tiw, god of war; Wednesday for Woden (Wotan, or Odin "father of gods and men"); Thursday for Thor (Thundergod); Friday for Frigg, wife of Odin.

[4] *The Encyclopedia Americana,* Americana Corp., N.Y., vol. 6, p. 623 (1951).

"*Creche,* Manger or crib (from old French)—a representation of the Nativity scene in the stable at Bethlehem."[5]

It took over a thousand years before the event was depicted in what we now call a "creche" or Nativity scene!

St. Francis of Assisi (1181–1226) is credited with instituting the "creche" custom at Christmas in 1223. He set up a crib in a cave at Greecio and used live cattle and sheep and local people to reenact the scene of the events described in Luke 2:1–16, when the shepherds came to Bethlehem to see the child in the manger.[6]

Various versions of the scene of the child, his mother, St. Joseph, shepherds, sheep, cattle, "Wisemen" or "Kings," has become popular as one of the many cultural symbols associated with Christmas. Tableaus or plays by children depicting the scene are common forms of Christmas activity.

The development of the story of the "Three Kings" who followed the star and brought gifts of "gold, frankincense and myrrh" to the Christ child is interesting as cultural history.

None of the English versions of the New Testament in Matthew, Chapter two, refer to the "wisemen from the East" as "Kings" or "Magi" and none say there were three of them. They give no number.

The *Rheims* version of 1582 refers to them as "sages." The other versions, *Tyndale* (1525), *Great Bible* (1539), *Geneva Bible* (1560), *Bishops' Bible*

---

[5] *Webster's Seventh New Collegiate Dictionary,* G.&C. Merricam Co., Springfield, Mass (1965)

[6] *A Catholic Dictionary,* ed. by Donald Attwater, The MacMillen Co., New York (1961); *St. Francis of Assisi,* Lawrence Cunningham, Harper and Row, San Francisco, California, pp. 34–35, 122–123 (1981).

35

(1568), *King James Version* (1611), *American Standard Version* (1881) and finally the *Revised Standard Version* (1946) all refer to them as "wisemen."

The later designation of them as "Magi"—the priests and astrologers of Zoroastrianism in Persia or as "the Three Worshipful Kings," are all cultural accretions that have accumulated over the centuries. Much of the content of these stories has little to do with the scriptural accounts of the events with which they have become associated.

For instance, the cover of a large burial urn in the Church of St. Eustorgis, Milan, Italy, is marked *Sepulcrum Trium Magorum* (Tomb of the Three Magi). The tradition is that Emperor Constantine gave the relics of the Three Kings to Bishop Eustorgius of Milan, in the fourth century. They were moved to the Cathedral of Cologne, Germany, by Frederick Barbarossa in 1164. The remains are in three gold caskets in the Cathedral. *A Religious Guide To Europe,* by Daniel M. Madden, MacMillan Publishing Co., Inc., N.Y. (1975), pp. 140, 293; *The Story of The Three Kings, Melchior Balthaser and Jaspar,* by John of Hildesheim (fourteenth century), retold by Margaret B. Freeman, The Metropolitan Museum of Art, N.Y. (1955).

Now considered among those "secular" displays is a figure very much religious in origin, "Santa Claus." The name came about in this country because of a mispronunciation by others of "Sinte Klaas" or "St. Nicholas" by the Dutch settlers.[7] St. Nicholas historically was the Bishop of Myra in Lycia in southwestern

[7] The first church built in New Amsterdam—later New York—in the early 1600's, was the Dutch Reformed Church (Calvinist) but it was named "St. Nicholas." *(See, The Columbia Historical Portrait of New York,* John A. Kowenhoven, Doubleday & Company, Inc., Garden City, New York (1953).

Asia Minor in the fourth century. He was a patron saint of children and became for many "Father Christmas." His feast day is December 6th. He came to be associated with gifts for children and part of the Christmas celebration.[8] From the staid Bishop of Myra he became, in the famous poem, *A Visit From St. Nicholas,* ("T'was The Night Before Christmas . . .") by Clement C. Moore in 1823, ". . . a right jolly old elf." He filled the children's stockings with toys and then went up the chimney to his "miniature sleigh" and "eight tiny reindeer."[9]

In our opinion these other secular symbols of Christmas lose much of their significance in view of the Court's later holding in *Allegheny* where the majority approved a menorah display set next to a Christmas tree and a sign with a message from the mayor. The sign disclaimed any "endorsement" of any religion but was a salute to "liberty." These facts place the Waunakee display within the protections afforded the menorah display in *Allegheny.*

We have before us the same question the United States Supreme Court had before it a decade ago: Whether the Establishment Clause of the First Amendment prohibits a municipality from including a creche or nativity scene in its annual Christmas display.[10]

Like the case before us in Waunakee, the display in Pawtucket, Rhode Island, had been displayed during the Christmas season for forty years. *Lynch,* 465 U.S.

[8] *The Penguin Dictionary of Saints,* Donald Attwater, Penguin Books, Ltd., Harmondsworth, England, pp. 250–251 (1970).

[9] *The New Columbia Encyclopedia,* Columbia University Press, N.Y., p. 1827 (1975).

[10] *Lynch v. Donnelly,* 465 U.S. 668 (1984).

at 671. What the Supreme Court noted then is true ten years later, "The display is essentially like those to be found in hundreds of towns or cities across the Nation—often on public grounds—during the Christmas season." *Lynch,* p. 671. The Supreme Court concluded the display in Pawtucket did not violate the First Amendment and we reach the same conclusion as to the display in Waunakee.

The United States Supreme Court in *Lynch* made some other observations that are helpful in any evaluation of what is involved in considering such a display.

The federal district court had found that by including the creche in the Christmas display the city of Pawtucket "tried to endorse and promulgate religious beliefs. . . . erection of the creche has the real and substantial effect of affiliating the City with the Christian beliefs that this creche represents." A dividend appeals court affirmed and the Supreme Court reversed noting that "In every Establishment Clause case, we must reconcile the inescapable tension between the objective of preventing unnecessary intrusion of either the church or the state upon the other, and the reality that, as the court has so often noted, total separation of the two is not possible." *Lynch,* 465 U.S. at 672. (Citing *Lemon v. Kurtzman,* 403 U.S. 602, 614 (1971).

The Court went on to say:

> There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789. Seldom in our opinions was this more affirmatively expressed than in Justice Douglas' opinion *[Zorach v. Clauson,* 343 U.S. 306 (1952)] for the Court validating a program allowing release of public school students from classes to attend off-campus religious

exercises. Rejecting a claim that the program violated the Establishment Clause, the Court asserted pointedly:

'We are a religious people whose institutions presuppose a Supreme Being.' *Lynch,* 465 U.S. at 674–675.

The Court pointed out:

Our history is replete with official references to the value and invocation of Divine guidance in deliberations and pronouncements of the Founding Fathers and contemporary leaders. Beginning in the early colonial period long before Independence, a day of Thanksgiving was celebrated as a religious holiday to give thanks for the bounties of Nature as gifts from God. *Lynch,* 465 U.S. at 675.

The Court in a footnote, pp. 675–676, said:

An example is found in President Roosevelt's 1944 Proclamation of Thanksgiving:

'[I]t is fitting that we give thanks with special fervor to our Heavenly Father for the mercies we have received individually and as a nation and for the blessings He has restored, through the victories of our arms and those of our Allies, to his children in other lands.

'To the end that we may bear more earnest witness to our gratitude to Almighty God, I suggest a nationwide reading of the Holy Scriptures during the period from Thanksgiving Day to Christmas.' Presidential Proclamation No. 2629, 58 Stats. 1160.

This is an especially appropriate reminder in this year when we commemorate the landing of our troops on the beaches of Normandy on June 6th, fifty years

39

ago in World War II. Throughout the ceremonies at Normandy this month (June 1994) a religious atmosphere is pervasive. It includes the thousands of white crosses and Stars of David marking the graves of the fallen and the many prayers and speeches honoring their memories.

In a statement that applies directly to the case before us the Court in *Lynch* said:

> The city, like the Congresses and Presidents, however, has principally taken note of a significant historical religious event long celebrated in the Western World. The creche in the display depicts the historical origins of this traditional event long recognized as a National Holiday. *Id.* at 680.

> The narrow question is whether there is a secular purpose for Pawtucket's display of the creche. The display is sponsored by the city to celebrate the Holiday and to depict the origins of that Holiday. These are legitimate secular purposes. *Id.* at 681.

In a footnote in *Lynch* on page 681, the Court pointed out:

> The city contends that the purposes of the display are 'exclusively secular.' We hold only that Pawtucket has a secular purpose for its display, which is all that *Lemon v. Kurtzman,* 403 U.S. 602 (1971), requires. Were the test that the government must have 'exclusively secular' objectives, much of the conduct and legislation this Court has approved in the past would have been invalidated.

As the Court said in *Lynch,* on page 683:

> The dissent asserts some observers may perceive that the city has aligned itself with the Christian faith by including a Christian symbol in its display

and that this serves to advance religion. We can assume, *arguendo,* that the display advances religion in a sense; but our precedents plainly contemplate that on occasion some advancement of religion will result from governmental action. The Court has made it abundantly clear, however, that 'not every law that confers an 'indirect,' 'remote,' or 'incidental' benefit upon [religion] is, for that reason alone, constitutionally invalid.' *Nyquist,* 413 U.S. at 771; see also *Widmar v. Vincent,* 454 U.S. 263, 273 (1981). Here, whatever benefit there is to one faith or religion or to all religions, is indirect, remote, and incidental; display of the creche is no more an advancement or endorsement of religion than the Congressional and Executive recognition of the origins of the Holiday itself as 'Christ's Mass,' or the exhibition of literally hundreds of religious paintings in governmental supported museums. . . .

Even the traditional, purely secular displays extant at Christmas, with or without a creche, would inevitably recall the religious nature of the Holiday. The display engenders a friendly community spirit of goodwill in keeping with the season. *Id.* at 685.

We agree with the Court in *Lynch,* 465 U.S. at pp. 686–687, when it said:

It would be ironic, however, if the inclusion of a single symbol of a particular historic religious event, as part of a celebration acknowledged in the Western World for 20 centuries, and in this country by the people, by the Executive Branch, by the Congress, and the courts for 2 centuries, would so 'taint' the city's exhibit as to render it violative of the Establishment Clause. To forbid the use of this one passive symbol—the creche—at the very time people are taking note of the season with Christmas hymns and carols in public schools and other public

41

places, and while the Congress and legislatures open sessions with prayers by paid chaplains, would be a stilted overreaction contrary to our history and to our holdings. . . . *It is far too late in the day to impose a crabbed reading of the Clause on the country.* (Emphasis added.)

In *Allegheny,* the United States Supreme Court dealt with two holiday displays.

The first was a creche placed on the Grand Staircase of the Allegheny County Courthouse in Pittsburgh, Pennsylvania. The second was a Chanukah menorah just outside the City-County Building next to a Christmas tree and a sign "saluting liberty." The United States Third Circuit Court of Appeals ruled each display violated the Establishment Clause of the First Amendment because each had "the impermissible effect of endorsing religion." 842 F.2d 655 (1988), *Id.* 578–579.

The United States Supreme Court in an opinion written by Justice Blackmun, (parts of which were concurred in or dissented from, and separate opinions authored by Justices O'Connor, Brennan, Stevens and Kennedy, each of which concurred or dissented and joined by some but not all of the Justices); the result was that by a vote of five to four the Court held that the creche violated the Establishment Clause. A larger majority held the menorah did not.

In holding the "creche" was in violation of the Establishment Clause it was noted the creche was "on display on the Grand Staircase during the 1986–1987 holiday season from November 26 to January 9. The Grand Staircase was "the main," — "most beautiful,"[11] and "most public" part of the courthouse. It had a

---

[11] One wonders if the ruling would be different had it been in the "dingiest" or "ugliest" part of the courthouse.

wooden fence on three sides and bore a plaque stating, "this Display Donated by the Holy Name Society," with red and white poinsettia plants around the fence. The court adds, "[T]he county also placed a small evergreen tree decorated with a red bow, behind each of the two end posts. . . . These trees stood along side the manger backdrop and were slightly shorter than it was. . . . No figures of Santa Claus or other decorations appeared on the Grand Staircase." *Id.* 579–581.[12]

The manger included an angel bearing the words "Gloria in Excelsis Deo." *Id.* 580. In a five to four vote with Justice O'Connor writing a concurrence, the Court majority held the creche display was an affront to the First Amendment.

> In sum, *Lynch* teaches that government may celebrate Christmas in some manner and form, but not in a way that endorses Christian doctrine. Here, Allegheny County has transgressed this line. It has chosen to celebrate Christmas in a way that has the effect of endorsing a patently Christian message: Glory to God for the birth of Jesus Christ. Under *Lynch,* and the rest of our cases, nothing more is required to demonstrate a violation of the Establishment Clause. The display of the creche in this context, therefore, must be permanently enjoined. *Allegheny,* 492 U.S. at 601–602.

The angel with the sign, "Gloria in Excelsis Deo," was the recipient of much criticism from Justice Blackmun. No estimate was given as to how many of the observers of the display understood Latin but the

---

[12] The concern for lack of a Santa Claus is curious since the author, Justice Blackmun, dissented in the *Lynch* case where a Santa Claus House, reindeer and other secular objects were prominently displayed around the creche.

translation given by the Court is curious. The Court said:

> Indeed, the creche in this lawsuit uses words, as well as the picture of the Nativity scene, to make its religious meaning unmistakably clear. "Glory to God in the Highest!" says the angel of the creche—Glory to God because of the birth of Jesus. This praise to God in Christian terms is indisputably religious—indeed sectarian—just as it is when said in the Gospel or in a church service. *Allegheny,* 492 U.S. at 598.

All the Latin phrase says is, "Glory to God in the highest." The sign does not say "Glory to God because of the birth of Jesus." Even the account in Luke, chapter two, verse fourteen, doesn't say it. It says: "Glory to God in the highest and on earth peace among men with whom he is pleased." (RSV)

In the Waunakee case we do not have the angel with the sign. However, it seems certain the majority in *Allegheny* would have disapproved of the creche even without the offending angel!

Justice Kennedy concurred in the approval of the menorah display but wrote a strong dissent to the majority's disapproval of the creche. He was joined by Chief Justice Rehnquist and Justices White and Scalia.

Justice Kennedy said in part:

> The majority holds that the County of Allegheny violated the Establishment Clause by displaying a creche in the county courthouse, because the 'principal or primary effect' of the display is to advance religion within the meaning of *Lemon v. Kurtzman,* 403 U.S. 602, 612–613 (1971). This view of the Establishment Clause reflects an unjustified hostility toward religion, a hostility inconsistent with our

history and our precedents, and I dissent from this holding. The creche display is constitutional, and, for the same reasons, the display of a menorah by the city of Pittsburgh is permissible as well. On this latter point, I concur in the result, but not the reasoning, of Part VI of JUSTICE BLACKMUN's opinion. *Allegheny,* 492 U.S. at 655.

Government policies of accommodation, acknowledgment, and support for religion are an accepted part of our political and cultural heritage. As Chief Justice Burger wrote for the Court in *Walz v. Tax Comm'n of New York City,* 397 U.S. 664 (1970), we must be careful to avoid '[t]he hazards of placing too much weight on a few words or phrases of the Court,' and so we have 'declined to construe the Religion Clauses with a literalness that would undermine the ultimate constitutional objective as illuminated by history.'

Rather than requiring government to avoid any action that acknowledges or aids religion, the Establishment Clause permits government some latitude in recognizing and accommodating the central role religion plays in our society. *Lynch v. Donnelly,* supra, at 678; *Walz v. Tax Comm'n of New York City,* Supra, at 669. Any approach less sensitive to our heritage would border on latent hostility toward religion, as it would require government in all its multifaceted roles to acknowledge only the secular, to the exclusion and so to the detriment of the religious. *Allegheny,* 492 U.S. at 657.

In *Zorach v. Clauson,* 343 U.S. 306 (1952), for example, we permitted New York City's public school system to accommodate the religious preferences of its students by giving them the option of staying in school or leaving to attend religious classes for part of the day. Justice Douglas wrote for the Court:

45

> When the state encourages religious instruction . . . it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe. *Id.* at 658.

Justice Kennedy then opined:

> Nothing in the First Amendment compelled New York City to establish the release-time policy in *Zorach,* but the fact that the policy served to aid religion, and in particular those sects that offer religious education to the young, did not invalidate the accommodation. *Id.* at 658.

The Kennedy dissent continues:

> The Religious Clauses do not require government to acknowledge these holidays or their religious component; but our strong tradition of government accommodation and acknowledgment permits government to do so. *Id.* at 664.

> Respondents say that the religious displays involved here are distinguishable from the creche in *Lynch* because they are located on government property and are not surrounded by the candy canes, reindeer, and other holiday paraphernalia that were a part of the display in *Lynch.* Nothing in Chief Justice Burger's opinion for the Court in *Lynch* provides support for these purported distinctions. After describing the facts, the *Lynch* opinion makes no mention of either of these factors. It con-

46

centrates instead on the significance of the creche as part of the entire holiday season. Indeed, it is clear that the Court did not view the secular aspects of the display as somehow subduing the religious message conveyed by the creche, for the majority expressly rejected the dissenters' suggestion that it sought 'to explain away the clear religious import of the creche' or had 'equated the creche with a Santa's house or reindeer.' Crucial to the Court's conclusion was not the number, prominence, or type of secular items contained in the holiday display but the simple fact that, when displayed by government during the Christmas season, a creche presents no realistic danger of moving government down the forbidden road toward an establishment of religion. Whether the creche be surrounded by poinsettias, talking wishing wells, or carolers, the conclusion remains the same, for the relevant context is not the items in the display itself but the season as a whole. *Id.* at 665–666.

It is clear that the four Justices in the Justice Kennedy dissent would approve the Waunakee creche.

It seems certain that Justice O'Connor, based on the reasons behind her concurrence in approving the menorah display, would permit the Waunakee creche, she states:

I also conclude that the city of Pittsburgh's combined holiday display of a Chanukah menorah, a Christmas tree, and a sign saluting liberty does not have the effect of conveying an endorsement of religion.

*Id.*, p. 632, O'Connor, J., concurring.

She explains why: "[T]he Christmas tree, whatever its origins, is not regarded today as a religious symbol." She refers to "the religious nature of the

47

menorah and the holiday of Chanukah." *Id.* 633. "The question here is whether Pittsburgh's holiday display conveys a message of endorsement of Judaism, when the menorah is the only religious symbol in the combined display . . ." *Id.* 634. In summary she points out:

> In setting up its holiday display, which included the lighted tree and the menorah, the city of Pittsburgh stressed the theme of liberty and pluralism by accompanying the exhibit with a sign bearing the following message: " *'During this holiday season, the city of Pittsburgh salutes liberty. Let these festive lights remind us that we are the keepers of the flame of liberty and our legacy of freedom.'* " *Ante,* at 582. This sign indicates that the city intended to convey its own distinctive message of pluralism and freedom. By accompanying its display of a *Christmas tree—a secular symbol of the Christmas holiday season—with a salute to liberty,* and by adding a religious symbol from a Jewish holiday also celebrated at roughly the same time of year, I conclude that the city did not endorse Judaism or religion in general, but rather conveyed a message of pluralism and freedom of belief during the holiday season. *Id.* at 635 (emphasis added).

The menorah was eighteen feet high and next to a forty-five foot decorated Christmas tree.

This parallels the setting of the Waunakee creche. The creche is surrounded by the large Christmas trees and as in the Pittsburgh display has a "salute to liberty" by the Village Board that is even more inclusive and demonstrates clearly the non-endorsement intentions of the Village Board.

> *'During the Holiday Season, the Village of Waunakee salutes liberty. Let these festive lights and times remind us that we are the keepers of the*

48

*flame of liberty and our legacy of freedom. Whatever*
*your religion or beliefs, enjoy the holidays.*
Waunakee Village Board'<br>(Emphasis added.)

It clearly meets the test described by Justice O'Connor and apparently was drafted purposely to meet that requirement. We agree with the court of appeals that Waunakee met the test.

Thus, we conclude a majority of the present court would approve the Waunakee holiday display.

The Plaintiffs' in the case before us have tried to attack the meaning of the Waunakee sign as only greeting those with religious faith because of its statement, "whatever your religion or beliefs enjoy the holidays." The plaintiffs' argue here as they did in the court of appeals that the quoted last sentence "runs afoul of the Endorsement test by making adherence to a religion relevant to a person's standing in the community" because it "sends a message" to people without religious beliefs "that enjoyment of the holidays is somehow related to religion or to beliefs which have religious meanings." Plaintiff says: "This is based on a literal interpretation of the words 'whatever your religion or beliefs, enjoy the holidays' is directed to people who have 'religion or beliefs,' not to non-believers."

The court of appeals was correct when it stated:

> We think that stretches the point beyond reason. The sentence may be read equally, if not more persuasively, to send a greeting to persons who have a professed religion of any kind as well as to those whose beliefs—whatever they may be—embrace other spiritual precepts, or none at all. In other words they greet and treat both believers and non-believers equally. We do not see such a constructed ambiguity as in any way diluting the secular con-

tent of the sign, much less turning it into a sectarian endorsement of religion or religious beliefs.

The majority opinion in *Allegheny* at page 589 correctly used the word "beliefs" in the same sense as our court of appeals understood it:

> adherents of religions too numerous to name have made the United States their home, as have those *whose beliefs expressly exclude religion* (Emphasis added).

Some nits aren't worth picking!

We do not find several subsequent lower federal court decisions following *Allegheny* cited by the Plaintiffs in this case very helpful. Mostly they involve facts that materially deviate from the facts in the case before us.

*In A.C.L.U. v. County of Delaware,* 726 F. Supp. 184, 189 (S.D. Ohio E.D. 1989) (cited by Plaintiffs), the Court held that a creche on a courthouse lawn violated the Establishment Clause. A five foot evergreen "peace tree" with Christmas decorations was located ninety feet from the nativity display and was the only secular aspect of the Christmas season displayed. (There was no "Liberty" sign as in the *Allegheny* menorah case.)

The district court said:

> The Court concludes that the nativity scene display runs afoul of the Supreme Court's decision in *County of Allegheny.* The context of the display is more like the nativity scene display in *County of Allegheny* than the menorah display in *County of Allegheny* or the nativity scene in *Lynch.*

The facts in *A.C.L.U.* are very different from those in Waunakee.

50

As we have noted the display in Waunakee does conform to the reasons given for approval of the menorah in *Allegheny.*

The Plaintiffs direct our attention to the case of *Doe v. Small,* 934 F.2d 743, 747 (7th Cir. 1991). The facts in that case are quite unlike the case before us. The description given by the court says:

> In most years since 1956, during the Christmas season in Ottawa, a passer-by traveling on LaSalle Street along the western edge of the Park would see the following 16 paintings, each measuring 8 feet 8 inches in height, displayed in two lines that form a "V" spanning most of the Park's west side. No matter whether it was the day or night, the paintings were clearly visible at all times, being illuminated at night by street lights.
>
> The paintings together tell the story of the life, crucifixion and resurrection of Jesus Christ, as told in the four gospels of the New Testament.

These facts are entirely different than the facts in the case before us. In a two to one decision, (with a strong dissent by Judge John L. Coffey, a former Justice of this Court) the Seventh Circuit Court declared that the display in *Doe,* owned by a private organization, the "Jaycees," violated the Establishment Clause. Reversed on other grounds (*en banc*) 964 F.2d 611 (7th Cir. 1992).

We conclude that cases from lower federal courts before and after *Lynch* and *Allegheny* are not very helpful. Because of the present composition of the Court and the thorough discussion and analysis given in *Lynch* and *Allegheny* on facts closer to the Waunakee case, the most authoritative sources are found in those

51

cases. Our analysis persuades us that the trial court and the appellate court in the Waunakee case must be affirmed. There is no violation of the Establishment Clause.

The Petitioners ask that we declare that the Waunakee display violated Art. I, sec. 18 of our state Constitution. This is Wisconsin's equivalent of the Establishment and Free Exercise Clause of the United States Constitution. It reads as follows:

> The right of every person to worship Almighty God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend, erect or support any place of worship, or to maintain any ministry, without consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries.

The Wisconsin Constitution recognizes and accepts the idea of God. The Preamble reads as follows:

> PREAMBLE We, the people of Wisconsin, grateful to Almighty God for our freedom, in order to secure its blessings, form a more perfect government, insure domestic tranquility and promote the general welfare, do establish this constitution.

An analysis of the language in Art. I, sec. 18, leads to the conclusion that the Waunakee display does not violate its demands.

The display is not a place of worship, it is not a "ministry," no "preference" is given to "any religious

establishments"[13] or modes of worship, nor was any money drawn from the treasury for the benefit of any religious societies or for any religious or theological seminaries.

Even applying the United States Supreme Court's interpretation of "establishment," we have already concluded that "endorsement" was absent here.

The Plaintiffs cite *State ex rel. Reynolds v. Nusbaum,* 17 Wis. 2d 148, 115 N.W.2d 761 (1962). This Court in a five to two decision invalidated a statute permitting tax supported transportation for pupils attending parochial schools. The majority held it violated the provision in Art. I, sec. 18, "[n]or shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries." The Court said:

> We construe 'religious societies' to be synonymous with religious organizations, and, under the stipulated facts, practically all of the nonpublic schools, whose pupils are to be transported under the attacked act, are operated by religious organizations. Furthermore, at the time of the adoption of our constitution in 1848, the word 'seminaries' was synonymous with academies or schools. *State ex rel. Weiss v. District Board* (1890), 76 Wis. 177, 215, 44 N.W. 967. Other courts have held that the term "seminary" includes primary and secondary schools. *Id.* at 156.

---

[13] At the time our Constitution was adopted, 1848, we must assume the term referred to a "particular system of faith and worship recognized and practiced by a particular church, sect, or denomination." *Black's Law Dictionary, supra,* p. 1523.

As a result of the ruling the people of Wisconsin amended the Constitution in 1967 to add sec. 23 to Art. I which reads:

> Nothing in this constitution shall prohibit the legislature from providing for the safety and welfare of children by providing for the transportation of children to and from any parochial or private school or institution of learning.

The clause about supporting a "ministry" is not considered by the legislature as barring the provisions in sec. 13.125 for paying chaplains for opening prayers in the Senate and Assembly. This is, of course, consistent with the same practice followed in the United States Senate and House of Representatives.

We find nothing in Art. I, sec. 18, being violated by the Village of Waunakee Christmas seasonal display.

We reach this conclusion even assuming that this provision in the last clause may be "less flexible" than the First Amendment. *State ex rel. Reynolds,* 17 Wis. 2d at 149.

However, as noted by our court of appeals referring to Art. I, sec. 18 in the case before us:

> The cited section is, of course, the Wisconsin counterpart to the federal Establishment Clause. *State ex rel. Holt v. Thompson,* 66 Wis. 2d 659, 676, 225 N.W.2d 678, 687 (1975). " 'While [the] words used may differ, both the federal and state constitutional provisions relating to freedom of religion are intended and operate to serve the same dual purpose of prohibiting the 'establishment' of religion and protecting the 'free exercise' of religion.' " *State ex rel. Warren v. Nusbaum,* 55 Wis. 2d 316, 332, 198 N.W.2d 650, 658 (1972).

As a result, we interpret and apply Art. I, sec. 18 in light of United States Supreme Court cases interpreting the Establishment Clause. *American Motors Corp. v. ILHR Dept.,* 91 Wis. 2d 14, 29, 286 N.W.2d 847, 854 (Ct. App. 1979), rev'd. on other grounds, 101 Wis. 2d 337, 305 N.W.2d 62 (1981). We have, of course, considered and applied those cases in arriving at our conclusion that the Waunakee display passes federal constitutional muster.

And while the Kings have referred us to language in an earlier Wisconsin Supreme Court case, *State ex rel. Reynolds v. Nusbaum,* 17 Wis. 2d 148, 165, 115 N.W.2d 761, 770 (1962), suggesting that the Establishment Clause 'lends itself to more flexibility of interpretation' than the 'religious benefit' clause of the Wisconsin Constitution, the Wisconsin court has not elaborated on that statement in any subsequent case cited to us. *King,* 175 Wis. 2d at 318–319.

We agree with this analysis.

Counsel for plaintiffs conceded at oral argument that we must look to the federal Establishment Clause cases in interpreting Art. I, sec. 18. We conclude there is no violation of our State Constitution in the case before us and no violation of the Establishment Clause of the First Amendment of the United States Constitution, we therefore affirm the court of appeals.

Christmas is a national and state holiday.

Section 230.35(4)(a), Stats., provides in part:

"[t]he offices of the agencies of state government shall be kept open . . . except . . . the following holidays: . . . 2. after 12 noon on Good Friday, in lieu of the period specified in s.895.20;[14] . . . 7. December 24; 8. December 25; . . ."

---

[14] Section 895.20 provides in part:

The six week holiday display in Waunakee costs the Village approximately $500. Under our ruling it is a proper expenditure. It is also *de minimis*.

The two day Christmas holiday given by the state "costs" approximately $12,000,000.[15]

What we have in the Waunakee case is a recognition that Christmas has its historical origin in the birth of Jesus. As was noted in *Lynch* recognition of that history in a nativity scene constitutes a "secular purpose" that meets the requirements of "secular purpose" set forth in *Lemon,* cited in *Lynch.* What we see is over a thousand year history of a mixture of pre-Christian elements and cultural additions to the holiday that has often converted originally "religious" personages and symbols into secular ones through usage.

Out of this mixture created by society's desire to celebrate its heritage—and its hopes—we have seen that some "religious" elements that are part of the history do in fact meet the most recent interpretation of the Establishment Clause, *i.e.,* the endorsement test. Recognition is not the same as endorsement. The "salute to liberty" sign in Waunakee as in Pittsburgh makes that point clear.

This vindication is an example of how courts must enforce and protect even the rights of the "majority." All of us, individually, are members of various "minority" groups or "majority" groups, depending on the

Legal Holidays . . . On Good Friday the period from 11 a.m. to 3 p.m. shall uniformly be observed for the purpose of worship. . . .

[15] These figures are based on the state payroll for month of October 1991 of $188,084,000. *"WISCONSIN STATE AND LOCAL GOVERNMENT EMPLOYMENT AND PAYROLLS for October 1982–1991. State of Wisconsin Blue Book, 1993–1994,"* p. 719.

issue at stake. All must look to the courts for protection and vindication. This case is a good example.

*By the Court.*—The decision of the court of appeals is affirmed.

HEFFERNAN, CHIEF JUSTICE *(dissenting).* From November 29, 1990, to January 3, 1991, the village of Waunakee displayed a seven by seven and one-half foot creche in a city park, near lighted evergreen trees and a sign saluting liberty. The creche is a religious symbol portraying an event central to the Christian faith. By displaying the creche in these circumstances, the village of Waunakee pays homage to one religious faith, thereby expressing a preference for that faith. This action is in violation of Article I, section 18 of the Wisconsin Constitution, which states, "[N]or shall . . . any preference be given by law to any religious establishments or modes of worship." Because the majority concludes otherwise, I dissent. Because I have determined that the display is in violation of the Wisconsin Constitution, I do not discuss whether the display also violates the United States Constitution.

This court has long concluded that Article I, section 18 of the Wisconsin Constitution provides greater protection of religious liberty than do the religion clauses in the First Amendment to the United States Constitution. *See State ex rel. Reynolds v. Nusbaum,* 17 Wis. 2d 148, 115 N.W.2d 761 (1962); *State ex rel. Warren v. Reuter,* 44 Wis. 2d 201, 227, 170 N.W.2d 790 (1969). *See also State v. Doe,* 78 Wis. 2d 161, 171, 254 N.W.2d 210 (1977), which states that "it is the prerogative of the State of Wisconsin to afford greater protection to the liberties of persons within its boundaries under the Wisconsin Constitution than is

mandated by the United States Supreme Court under the Fourteenth Amendment."[1]

Adopting the analysis set forth by the court of appeals, the majority states that the United States Supreme Court cases interpreting the Establishment Clause are to be used to interpret Article I, section 18. By this statement, the court decides that the protection provided by Article I, section 18 is no greater than that provided by the Establishment and Free Exercise Clauses. For support, the court of appeals discussion, which the majority adopts, quotes *State ex rel. Warren v. Nusbaum,* 55 Wis. 2d 316, 332, 198 N.W.2d 650 (1972). Therein, this court stated, "While [the] words used may differ, both the federal and state constitutional provisions relating to freedom of religion are intended and operate to serve the same dual purpose of prohibiting the 'establishment' of religion and protecting the 'free exercise' of religion."

The majority misinterprets *Warren v. Nusbaum.* The language quoted above does not support the conclusion that cases interpreting the Establishment Clause of the United States Constitution define the extent of protection under the Wisconsin Constitution. Even assuming the general purposes of the United States and Wisconsin Constitutions are identical, the Wisconsin Constitution contains language indicating that the means used to achieve the purposes are different. Article I, section 18 is more prohibitive than the First Amendment of the United States Constitution.

---

[1] Most of the rights contained within the Bill of Rights in the United States Constitution are binding on the states through the Fourteenth Amendment. *See, e.g., Lynch v. Donnelly,* 465 U.S. 668, 671 (1984) (stating that the Establishment Clause in the United States Constitution applies to the states through the Fourteenth Amendment).

*State ex rel. Warren v. Reuter,* 44 Wis. 2d at 227. Furthermore, in *State ex rel. Warren v. Nusbaum,* this court had already determined that the challenged state action violated the United States Constitution before it considered the Wisconsin Constitution. Thus the discussion, that the two constitutions have similar purposes, was nothing more than an alternative way of stating that the Wisconsin Constitution cannot be interpreted to provide a lesser degree of protection than does the United States Constitution.

In two cases decided after *State ex rel. Warren v. Nusbaum,* the court cites the "dual purpose" language and then applies United States Supreme Court cases to interpret the Wisconsin Constitution. *See State ex rel. Wisconsin Health Facilities Authority v. Lindner,* 91 Wis. 2d 145, 163–64, 280 N.W.2d 773 (1979); *State ex rel. Holt v. Thompson,* 66 Wis. 2d 659, 675–78, 225 N.W.2d 678 (1975). These cases do not stand for the proposition that the Wisconsin Constitution should always be interpreted by looking solely to cases interpreting the United States Constitution. Both decisions acknowledge that the Wisconsin Constitution contains more specific language. Furthermore, in recognition of the differing language, the court in *Holt* briefly considers each clause of Article I, section 18. Even in the present case, the majority discusses each clause of Article I, section 18, although the discussion contains no analysis and is merely conclusory.

We would have to ignore the plain language of the constitutional provisions to conclude that the protection accorded under Article I, section 18 is exactly the same as that provided by the First Amendment to the United States Constitution. The language of these two provisions is very different. Article I, section 18, provides:

The right of every person to worship Almighty God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend, erect or support any place of worship, or to maintain any ministry, without consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries.

In contrast, the religion clauses in the First Amendment to the United States Constitution provide:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . .

The language of these two provisions differs greatly. We violate our oath to support the constitution of Wisconsin if we conclude that the protections provided by these two provisions are identical. Existing case law does not require us to interpret the two provisions in an identical fashion. Therefore, I consider whether the village of Waunakee's display violates Article I, section 18 of the Wisconsin Constitution.

I begin by considering whether the village of Waunakee shows a preference for the Christian faith by exhibiting the creche display in the present case, contrary to the portion of Article I, section 18 stating, "[N]or shall . . . any preference by given by law to any religious establishments or modes of worship." I first look to the nature of the symbol that the government of the village of Waunakee displays. It cannot be disputed that the creche is a religious symbol portraying an event central to the Christian faith. Christians believe

that God sent his son, Jesus Christ, into the world to be the Savior. The annual celebration of Christ's birth is one of the holiest days of the year for Christians. Christians believe that Mary gave birth to Jesus Christ in a stable in Bethlehem.[2] The creche is a symbol of Christ's birth and has no secular connotations. Indeed, any suggestion that the creche is secular in nature denigrates both the religious symbol and the Christian faith. Because it represents an event central to their faith, the creche is a symbol that Christians understandably revere.

The Waunakee creche is a traditional representation of the stable at Bethlehem and contains figures of the baby Jesus, Mary and Joseph. Figures of the shepherds and Magi are located near the stable in an attitude of worship. Atop a nearby flagpole is a five-pointed star, a symbol of the star of Bethlehem.

For purposes of the No Preference Clause of the Wisconsin Constitution, the significance of the creche as a religious symbol is the precise problem. The Waunakee village government is not displaying representations of the commercial aspects of the Christmas

---

[2] The nativity scene appears to derive, at least in part, from the Christian Gospel of Luke, which states:

[A]ll went to be taxed, every one into his own city.

And Joseph also went up from Galilee, out of the city of Nazareth, into Judea, unto the city of David, which is called Bethlehem, (because he was of the house and lineage of David)

To be taxed with Mary his espoused wife, being great with child.

And so it was, that, while they were there, the days were accomplished that she should be delivered.

And she brought forth her firstborn son, and wrapped him in swaddling clothes, and laid him in a manger; because there was no room for them in the inn.

2 Luke 3–7.

season, such as Santa Claus with his sleigh and reindeer. The village government is not exhibiting Christian symbols in a museum to explain the religious heritage of a portion of Waunakee's citizens. By displaying a seven by seven and one-half foot creche in a village park, the village of Waunakee is paying tribute to the religious aspect of Christmas and honoring the Christian faith. The residents of the village of Waunakee who worship God in religions other than Christianity, as well as residents who do not believe in God, are placed in the position of outsiders when the government pays homage to Christian symbols. Such action is an expression of preference for one religion and violates the No Preference Clause of the Wisconsin Constitution.

The three lighted evergreens near the creche do not change this display to one that is secular in nature. Even if the lighted evergreens are seen as representations of the secular aspect of Christmas, they are a secular image of the religious holiday that Waunakee honors by displaying a creche. The addition of lighted trees does not turn the display into an exhibit informing visitors of the secular and religious content of a holiday recognized in the area. The lighted trees, each over twenty feet in height, likely draw additional attention to the village government's display of a religious symbol. The trees do not nullify the message that the village is choosing to honor Christian beliefs.

The "salute to liberty" sign added by the village government also fails to negate the preference for Christianity expressed through the creche display.[3] Rather, the reverse is true—a large display of an important religious symbol, near lighted trees that are

---

[3] The sign states:

62

at most secular representations of the same religious holiday, negates the expressed statement that the village government is saluting liberty. It seems to me that if the village government really wished to "remind us that we are the keepers of the flame of liberty and the legacy of freedom", they would not limit the display to one religion's symbols. The Waunakee display does not send a message that we live in a pluralistic society in which each individual is free to choose his or her religious beliefs or nonbelief. Viewed as a whole, the display set out by the Waunakee village government celebrates only the liberty to practice the Christian faith.

I also conclude that the display violates the portion of Article I, section 18 which states "nor shall any money be drawn from the treasury for the benefit of religious societies . . .." The display was donated to the village of Waunakee. Nonetheless, the village must expend funds to put up and take down the display, and to store the display. Although the expenditure is not large, the clause prohibiting the drawing of money does not contain a *de minimis* exception. Guarantees of religious liberty should not be subject to *de minimis* legalistic reasoning.

During The
HOLIDAY
SEASON
The Village of Waunakee
Salutes Liberty

Let These Festive Lights
& Times Remind Us That We Are
The Keepers of the Flame of Liberty And
Our Legacy of Freedom. Whatever
Your Religion or Beliefs,
Enjoy the Holidays

Waunakee Village Board

When interpreting the provisions of the Wisconsin Constitution, this court also should consider the intent of the framers and the historical context in which the constitution was created. The record of the 1847 constitutional convention contains very little discussion of Article I, section 18, and no discussion of the preference and funding clauses. *See, 4 Constitutional Series: The Attainment of Statehood* 228, 312, 334, 713–15 (Milo M. Quaife ed. 1928).

However, an early decision of this court, *State ex rel. Weiss v. District Bd. of School Dist. No. Eight of Edgerton,* 76 Wis. 177, 44 N.W. 967 (1890), sets forth an explanation of conditions existing at the time the framers wrote the Wisconsin constitution. The *Weiss* court states these conditions may have influenced inclusion of the Article X, section 3 prohibition on sectarian instruction in public schools. I conclude that an understanding of these historical conditions is relevant any time this court interprets portions of the Wisconsin Constitution governing religious liberties. Discussing immigrants to Wisconsin, the court states:

> The immigrants came from nearly all the countries of Europe, but most largely from Germany and Ireland. As a class, they were industrious, intelligent, honest, and thrifty—just the material for the development of a new state. . . . They were also religious and sectarian. Among them were Catholics, Jews, and adherents of many Protestant sects. These immigrants were cordially welcomed, and it is manifest the convention framed the constitution with reference to attracting them to Wisconsin. Many, perhaps most, of these immigrants came from countries in which a state religion was maintained and enforced, while some of them were non-conformists and had suffered under the disabilities resulting

from their rejection of the established religion. What more tempting inducement to cast their lot with us could have been held out to them than the assurance that, in addition to the guaranties of the right of conscience and of worship in their own way, the free district schools in which their children were to be . . . educated, were absolute common ground, where . . . sectarian instruction, and with it sectarian intolerance, under which they had smarted in the old country, could never enter? Such were the circumstances surrounding the convention which framed the constitution. In the light of them, and with a lively appreciation by its members of the horrors of sectarian intolerance and the priceless value of perfect religious and sectarian freedom and equality, is it unreasonable to say that sectarian instruction was thus excluded, to the end that the child of the Jew, or Catholic, or Unitarian, or Universalist, or Quaker should not be compelled to listen to the stated reading of passages of scripture which are accepted by others as giving the lie to the religious faith and belief of their parents and themselves? *Weiss,* 76 Wis. at 197–198.

This history indicates that the framers wrote the Wisconsin constitution with an eye toward attracting settlers to Wisconsin by ensuring that the government would not dictate the form or content of religious practices. I believe we must interpret Article I, section 18 in accord with the framer's intent of maximizing religious liberty and freedom of religious choice. The conclusion that the village of Waunakee's display violates the No Preference Clause of the Wisconsin Constitution best furthers this intent.

*Weiss* teaches another important lesson. In *Weiss,* Roman Catholics with children attending the Edgerton public schools challenged the practice of Bible reading

65

in the school. In their petition, the parents stated that teachers were reading a version of the Bible, the King James version, that Catholics believed to be an incorrect translation. *Weiss,* 76 Wis. at 180. Further, the Catholic parents stated that the Catholic church teaches that the Bible should not be read indiscriminately, but should be explained by teachers and interpreters authorized by the Catholic church. *Id.* This court held that the practice of Bible reading in public schools violates Article X, section 3 of the Wisconsin Constitution, which prohibits "sectarian instruction" in the public schools. *Id.* at 199.

*Weiss* teaches the important lesson that government preference for a certain religion may violate the religious liberty of members of certain denominations within Christianity, the majority religion in Wisconsin, as well as the religious liberty of members of faiths in the minority in Wisconsin. The problem with the Waunakee government's action is not that the government is setting forth a Christian symbol, but that the government is granting a preferred status to one religion rather than maintaining a neutral stance toward all. The religious freedom of all citizens is threatened when the government expresses a preference for any one religious practice. While the Waunakee display sets forth a Christian symbol, the majority's decision will allow Wisconsin governmental bodies to display symbols inconsistent with, and even hostile to, Christianity.

The interpretation of Article I, section 18, of the Wisconsin Constitution set forth in this dissent is entirely consistent with every person's right, guaranteed by that same provision, "to worship Almighty God according to the dictates of conscience." Under the Wisconsin Constitution, the citizens of Waunakee have a

constitutional right to display creches outside or inside their homes. They also have the right to display the Star of David and other religious symbols. The right to follow one's own chosen method of worshipping God is enhanced, not diminished, by a decision that the Waunakee government must not express a preference for the symbols of any one religion.

For the reasons set forth above, I dissent.

I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissenting opinion.